IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SPECIALIZED SEATING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 1197 |
| | ) | |
| GREENWICH INDUSTRIES, L.P. d/b/a CLARIN | ) | |
| | ) | |
| Defendant, | ) | |

<u>MEMORANDUM OPINION FOLLOWING BENCH TRIAL</u>

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Specialized Seating, Inc. ("Specialized") sells folding chairs, as does the

defendant Greenwich Industries, L.P., under the name "Clarin."  In this case, Specialized seeks

declaratory relief invalidating registered U.S. Trademark Registration No. 2,803,875[1] owned by

_____

[1] Clarin's registered trademark consists of the following depicted folding chair:



and has the following                           written description:

THE MARK CONSISTS OF A CONFIGURATION OF A FOLDING CHAIR
CONTAINING AN X-FRAME PROFILE, A FLAT CHANNEL FLANKED ON EACH
SIDE BY ROLLED EDGES AROUND THE PERIMETER OF THE CHAIR, TWO
CROSS BARS WITH A FLAT CHANNEL AND ROLLED EDGES AT THE BACK
BOTTOM OF THE CHAIR, ONE CROSS BAR WITH A FLAT CHANNEL AND
ROLLED EDGES ON THE FRONT BOTTOM, PROTRUDING FEET, AND A BACK
SUPPORT, THE OUT SIDES OF WHICH SLANT INWARD.

(Pl. Ex. 1); (Def. Ex. 1.)

Clarin (Cmpl., Count I), (Dkt. No. 1), and Specialized seeks a determination that its x-frame, double-tube and channel folding chairs[2] do not infringe Clarin's registered trademark or common law trade dress (Cmpl., Count II).[3]  In addition to answering Specialized's claims, Clarin filed a counterclaim against Specialized, alleging infringement of Clarin's registered trademark and trade dress (Counterclaim, Count I), (Dkt. No. 6), and false designation of origin (Counterclaim, Count II).  On July 1, 2005, Specialized moved for a preliminary injunction.  (Dkt. No. 13.)  On September 1, 2005, the court held an evidentiary hearing on that motion.  Following that hearing, the parties settled that aspect of their dispute.  (Dkt. No. 35.)

After the completion of the parties' pretrial discovery and the filing of the pretrial order, the court conducted a multi-day bench trial, at which both sides presented testimony and other evidence.  After reviewing that evidence and considering the arguments of counsel, the court grants Specialized's request for declaratory judgment against Clarin on both its claims of trademark invalidity and noninfringement.  The court also finds against Clarin and in favor of Specialized on each of the allegations of Clarin's counterclaim, for the reasons stated below.

---

[2] Folding chairs made in the x-frame design are constructed so the chairs' legs intersect below the seat forming an "x," as compared to a y-frame, which is a frame whose legs intersect above the seat, forming an upside down "y."  (Tr. at 7, Pl. Ex. 30, Def. Ex. 269.)  Double-tube and channel steel is a flat piece of steel which has its sides rolled over to form what appears to be two tubes with a flat channel in between.  (Tr. at 73.)

[3] Specialized also sought in Count III of its complaint a declaration of invalid recordation by Clarin of its registered trademark with U.S. Customs and Board Protection ("U.S. Customs").  The allegations of Count III of Specialized's complaint do not constitute a separate claim independent of Count I but constitute a remedy upon a determination in Specialized's favor on Count I.  Clarin filed a motion arguing that Specialized waived the remedy of invalid recordation with U.S. Customs by failing to include the allegations of Count III in the Final Pretrial Order.  Because the court finds Count III to be a remedy and not an independent claim, the court denies Clarin's motion.

## FACTUAL BACKGROUND

In determining the case, the court finds the following facts.

A.      The Parties and their Previous Litigation

Plaintiff Specialized is a Nevada Corporation with its principal place of business in Morton Grove, Illinois.  Specialized has been in business since 1997 and sells various seating products including folding chairs.  Defendant Clarin is a Delaware limited partnership with its principal place of business in Lake Bluff, Illinois.  According to its sales literature, Clarin began making and selling a folding chair utilizing its x-frame with steel formed into a double-tube and channel in 1925.  Clarin presently offers the double-tube and channel, x-frame folding chair with an "A-back" or a "B-back" backrest.  (Tr. at 73-86.)  Clarin also offers an "Arch-back" backrest only for its children's line.[4]  (Tr. at 85-86.)

The A-back has sides that are bent inward just below the lower part of the backrest, forming a shoulder-style configuration to accommodate a back panel that is smaller than the width of the chair frame.  The sides of the B-back do not form a shoulder configuration but are slanted—instead of bent—inward at an angle starting just below the backrest to accommodate the smaller back panel.  (Tr. at 73-74; Pl. Ex. 31; Def. Ex. 269.)  Clarin's Arch-back chair's frame contains no bend or slant below the backrest.  (Def. Ex. 264.)

_____

[4]



A-back              B-back              Arch-back

3

On July 22, 1993, (Def. Ex. 25 at 2), Greenwich Industries, L.P., acquired Clarin and all its intellectual property. Prior to that, Harvey Hergott held the position of General Manager with Clarin, and his son Alfred Hergott was also a Clarin employee. (Tr. at 222-23.) As part of the terms of the acquisition, Harvey Hergott agreed to be a vice president and partner in the new Clarin. Alfred Hergott also remained a Clarin employee. (Tr. at 222, 331.)

In the latter part of 1993, Harvey and Alfred Hergott left Clarin and formed AOH International ("AOH"). (Tr. at 223, 331.) AOH began competing with Clarin in the folding chair market. (*Id.*) AOH sold both x-frame and y-frame chairs. (Tr. at 223-24.) The x-frame chairs sold by AOH were manufactured by Frank Lin ("Lin") in Taiwan. (Tr. at 224.) Lin had been Clarin's "exclusive sales rep" in Taiwan since sometime in the late 1980s. (Tr. at 224-26.)

Shortly after Harvey Hergott left Clarin in 1993, Clarin sued him in state court in Lake County, Illinois, alleging several grounds: violation of the Illinois Trade Secrets Act, breach of fiduciary duty, conversion, violation of the Uniform Deceptive Trade Practices Act, violation of § 1125(a) of the Lanham Act (unrelated to present lawsuit), tortious interference, fraud, constructive trust, and appropriation of corporate opportunity. (Def. Ex. 25; Tr. at 227, 231.) Clarin amended its complaint several times and a settlement was reached on September 13, 1996, where Hergott admitted to all the allegations in Clarin's Fourth Amended Complaint, which named as defendants: AOH, Harvey Hergott, and another individual named Harvey Cohen. (Def. Ex. 25; Tr. at 295-97.) Alfred Hergott, who was not named as a defendant to the lawsuit, agreed, as did Harvey Hergott, not to compete with Clarin in the double-tube and channel and x-frame chair market for a five-year period. (Def. Ex. 24 at 5-6; Tr. at 233-36, 331.) Harvey and Alfred Hergott wholly complied with this settlement agreement. (Tr. at 235, 331.)

In 1999, Alfred Hergott formed Specialized Seating, Inc. (Tr. at 330.) Harvey Hergott joined Specialized in November 2001. (Tr. at 239.) In 2002, after the five-year covenant not to compete had expired, Specialized began to sell x-frame chairs. (Tr. at 240, 330.) The chairs offered by Specialized incorporated a double-tube and channel, x-frame design with a back similar to the B-back design used by Clarin. (Tr. at 240, 355-57.) Specialized's chairs, however, differed in several ways from Clarin's asserted trade dress and the depiction in Clarin's registered trademark. For example, rather than using a single cross bar between the front legs, Specialized's folding chairs contained a K-brace.[5] (Tr. at 324-25, 342, 351.) Further, Specialized's folding chairs had a different frame for the seat cushion than that used by Clarin and Specialized's folding chairs have different ganging brackets than Clarin's, although both companies' ganging brackets are in the channel of the chair frame between the double-tube. (Tr. at 285-86, 347, 350.) In addition, Clarin does not make a chair that incorporates all elements of the folding chair depicted in its registered trademark; rather, the Clarin chair that most closely resembles the folding chair depicted in the registered trademark is the Model 2617. (Def. Ex. 266.) Even that particular Clarin chair model, however, does not have a flat channel cross-bar between the legs. Instead, it has cross bars that are "embossed," meaning a raised line is imprinted across the middle of the flat channel.[6] (Tr. at 74-79.) This embossing adds strength to

---

[5] A K-brace is a flat channel bar that attaches at one end to the lower part of the folding chair's leg and at the other end to a horizontal cross-bar at a higher point between the two legs of the folding chair to form a diagonal between the chair leg and the cross bar. (Pl. Ex. 32.)

[6]The drawing of Clarin's mark, without the embossing on the cross bar, still fits the application requirement that a drawing of the mark must be "a substantially exact representation of the mark as intended to be used on or in connection with the goods or services." *See* T.M.E.P. §807.12(a) (4th Ed. 2005).

the Clarin chair's cross bars. (Tr. at 79; Def. Ex. 209, Ex. 6 at 2571.)

In 2002, Clarin filed suit against Specialized in federal district court, alleging common-law trademark infringement by Specialized of Clarin's B-back chair design. *See Greenwich Industries, L.P. v. Specialized Seating, Inc*., No. 02-C-5000, (N.D. Ill.). That case, which was assigned to District Judge Suzanne Conlon, was dismissed with prejudice with leave to reinstate within a period of time when counsel informed Judge Conlon that the case had been settled. (Tr. at 333.) No written settlement agreement was ever signed by all the parties, but Clarin did not reinstate the lawsuit and the time for Clarin to do so expired.

B.      Clarin's Patents

From 1926 and continuing through 1964, Clarin obtained and held several now-expired U.S. patents related to its x-frame folding chair. The first patent, No. 1,600,248, ("the '248 patent"), issued on September 21, 1926, claimed an invention for a folding chair that folded flat with its back legs folding inside the front legs. The patent provided that "Our invention pertains to a folding chair, and has for its main object to provide a light and durable chair constructed from thin, light metal or similar, suitable material, and which chair is so shaped and arranged as to provide a maximum of strength with a minimum of material." (Pl. Ex. 2, pg. 1, ln. 1-7.) The patent disclosed in the specification the functionality of a double-tube and channel frame:

> The legs and also the frame part 13 are preferably constructed from thin metal bars which have curved portions extending lengthwise thereof, for reinforcement, and we preferably provide this reinforcement by curving both longitudinal edges of each bar, thus forming hollow or cylindrical portions extending lengthwise of each member and suitably spaced . . .

(*Id*. at pg. 1, ln. 47-55.) In addition, the '248 patent's specifications discussed that a cross bar connecting the legs at their lower portions acts "as bracing and spacing members for the legs."

(*Id*. at pg. 1, ln. 56-60.)

Clarin's second U.S. Patent, No. 1,943,058 ("the '058 patent"), issued in 1934, claimed an invention whereby the arrangement of the elements of the x-frame allowed the chair to collapse automatically on falling to the floor. (Pl. Ex. 3, pg. 1, ln. 5-10.) This automatic collapsing feature of an x-frame chair was disclosed in the patent as a significant safety advantage in case of an emergency when such chairs are used in large auditoriums. (*Id*. at pg. 1, 19-23.)

In 1938, Clarin obtained a U.S. Patent, No. 2,137,803 ("the '803 patent"), for the covering of the tips of the chair legs consisting of "a foot in the form of a block of solid rubber or other flexible material and a fastener for securing the foot to the lower end of the chair leg" of its double-tube and channel x-frame chair. (Pl. Ex. 4, pg. 1, col. 1, ln. 3-6.) The novelty of the '803 patent's invention (*Id*. at pg. 2, ln. 16-34) was its u-shaped fastener that had a "wide flat imperforate base," which functionally prevented the chair legs from making dents and grooves in the surface of the floor, kept the tip or end of the metal chair leg from cutting into the rubber foot, and provided a secure grip between the fastener and the rubber foot. (*Id.* at pg. 1, col. 1, ln. 16-37.) The patent claimed:

> A chair tip of the class described, comprising a foot, and a fastener for securing the same to the lower end of the chair leg having hollow beads on its longitudinal edges, said fastener comprising a U-shaped metal member having arms adapted to fit frictionally in said beads and a flat bottomed base of greater width than the bead engaging portions of said arms, said base and the lower portion of said arms being embedded in said foot.

(Pl. Ex. 4 at pg. 2, col. 1, ln. 25-34.) In more simple terms, the '803 patent claims Clarin's protruding foot contains the "flat bottomed base of greater width than the bead engaging portions of said arms" and claims a fastener that attaches into the chair legs' hollowed double-tubes of the double-tube and channel frame. (Pl. Ex. 4 at pg. 2.) The Clarin chair's protruding foot, which is

a part of the '803 patent claims, houses the base claimed in the patent as shown in Figure 5 of the '803 patent (*id.* at pg. 3), and by so doing provides the referenced functional feature that it "will not dent, score or otherwise mar the surface of the floor if brought in contact therewith." (*Id.* at pg. 1, col. 1, ln. 35-36.)

In 1964, Clarin obtained U.S. Patent, No. 3,127,218, ("the '218 patent") covering the ganging devices used to connect a series of Clarin double-tube and channel x-frame chairs next to one another in a row. (Pl. Ex. 6, col. 1, ln. 22-35.) The '218 patent disclosed that the ganging devices would be inserted into the channel between the tubes on the sides of the folding chairs' chair frame so as to be unobtrusive and not interfere with the folding function of the chairs. (*Id.*) Specifically, the '218 patent claims that:

> each of said legs is formed with an outwardly channel section and each of said bracket plate portions has a pair of inwardly offset tongue portions for securing said bracket plate portions to the web of said channel section with the main central portion of said plate projecting outwardly beyond the flanges of the channel section on the leg.

(Pl. Ex. 6, Col. 4, ln. 32-39.) The '218 patent establishes the functionality of the channel frame of the Clarin folding chairs' legs by functionally accommodating the insertions of the folding chair ganging devices into the channel between the double tubes.

C.      The History of Clarin's Registered Trademark

On May 7, 1999, Clarin filed its Trademark Application ("Application") for the configuration of a folding chair. (Pl. Ex. 1, 36.) In its 1999 Application, Clarin submitted a depiction of a folding chair and stated only that the Application sought a trademark for a "configuration of a folding chair" as the written description. (Pl. Ex. 36, ¶ 2; Def. Ex. 298.) On October 22, 1999, the U.S. Patent and Trademark Office ("PTO") issued its first Office Action ("Office Action,") (Pl. Ex. 37), in response to Clarin's Application refusing Clarin's Application

on the grounds that the requested mark appeared to be functional and was not inherently distinctive. The PTO in that 1999 Office Action requested from Clarin information about "whether the proposed mark is the subject of either a design or utility patent" and ordered Clarin to provide "all information concerning the patent." (Pl. Ex. 37 at 2.)

On April 24, 2000, Clarin submitted its response to the 1999 Office Action that refused registration. (Pl. Ex. 38.) In Clarin's response to the PTO's Office Action ordering disclosure of "all information concerning [any] patent" of which "the proposed mark is the subject," Clarin disclosed only Clarin's '058 Patent. (Pl. Ex. 38 at 4.) Clarin stated in its 2000 response that the '058 patent did not cover "distinctive design elements that make up the Clarin Chair mark, such as the double-tube channel frame." (*Id*. at 4.) Clarin emphasized that the '058 patent "states that there may be a back 'of any desired types,' a frame 'of any desired type,' and rear legs 'of any desired types.'" (*Id*. At 5.) Clarin explicitly stated that "What the Applicant seeks to register—the specific configuration of the chair, with the specific double-tube frame, the double horizontal supports on the rear legs, and the 'X' shape formed by the intersection of the chair legs—is not covered by the '058 patent." (*Id*. at 5.) Also in its 2000 response, Clarin discussed other folding chair configurations in the market, and stated that the other "[f]olding chair configurations do not have the X-frame, the double-tube channel frame, or the double horizontal supports on the rear legs." (*Id*. Ex. 2 ¶ 5.)

In its April 24, 2000 response, Clarin did not inform the PTO of the other U.S. Patents that Clarin owned involving elements of the folding chair configuration for which Clarin sought trademark registration, nor did Clarin explicitly mention the inward-slanting back-panel design of the "B-back" as part of the folding chair's distinctive features. (Pl. Ex. 38.) On January 16,

2001, the PTO again issued an Office Action refusing the Application on the grounds that

Clarin's requested mark appeared to be functional and the mark was not inherently distinctive.

(Pl. Ex. 39.)  In the 2001 Office Action, the PTO examiner posed specific interrogatories to be

answered by Clarin.  (*Id*. at 2.)

On July 16, 2001, Clarin provided answers to the PTO's interrogatories in Clarin's

response to the PTO's 2001 Office Action.  (Pl. Ex. 40.)  Again, Clarin did not disclose any

other U.S. Patent other than the '058 patent involving any element of the chair configuration for

which Clarin sought trademark registration.  Clarin, however, provided to the PTO as an exhibit

a specification for the Model #2000SB, which described the rubber feet of the Clarin chair model

using language culled from, but without citation to, Clarin's '803 patent.  (Def. Ex. 209, Ex. 6 at

2571.)  On January 9, 2002, the PTO issued an Office Action that constituted the final refusal of

the Application on the grounds that Clarin's requested mark appeared to be at least de facto

functional and the mark was not inherently distinctive.  (Pl. Ex. 42.)

On July 8, 2002, Clarin submitted its Request for Reconsideration, which amended

Clarin's 1999 description, which had stated that its proposed mark was "a configuration of a

folding chair" (Pl. Ex. 36 ¶ 2), to state the following:

> The mark consists of a configuration of a folding chair containing an X-frame
> profile, a flat channel flanked on each side by rolled edges around the perimeter
> of the chair, two cross bars with a flat channel and rolled edges at the back bottom
> of the chair, one cross bar with a flat channel and rolled edges on the front
> bottom, protruding feet, and a back support, the outer edges of which slant
> inward.

(Pl. Ex. 29 at ¶ 2.)  In support of its Request for Reconsideration, Clarin submitted the

Supplemental Declaration of William F. Peterson, the then-President and Chief Operation

Officer of Clarin, which stated that:

prior management slightly modernized the configuration of the outer edges of the back support of the "A Back" chair. This chair, which we call the "B Back" chair and is the subject of this trademark application, is our flagship product.

(Pl. Ex. 43 ¶ 4.) Clarin still did not disclose any of the other U.S. Patents that Clarin owned involving elements of the folding chair configuration for which it sought trademark registration. Clarin also did not disclose to the PTO any reason for the B-back design other than as a "slightly modernized" version of Clarin's A-back. (*Id*.) Clarin's U.S. Trademark Registration No. 2,803,875 issued on January 13, 2004.

Following the issuance of U.S. Trademark Registration No. 2,803,875, Clarin registered and recorded its trademark with U.S. Customs and Border Protection, Department of Homeland Security, ("U.S. Customs") and initiated requests that U.S. Customs seize Specialized's chairs at the border as counterfeit. (Tr. at 333-34.) As a result, U.S. Customs seized several shipments of Specialized folding chairs as the shipments were about to enter the United States. (Pl. Exs. 10, 11, and 12; Tr. at 334.)

D.   Functionality of the Individual Features of the Folding Chair Depicted in Clarin's Registered Trademark and Clarin's Common Law Trade Dress

Clarin conceded in its counsel's opening statement at the trial that "all of the features that are — make up the trademark application, the x-frame, the double-tube and channel perimeter, the crossbar across the front, the double crossbar across the back, and the padded feet, all have functional features." (Tr. at 56.) The evidence at trial also demonstrated that the expired patents owned by Clarin discussed and described the function of the elements that are part of the folding chair depicted in Clarin's registered trademark. The double-tube and channel of the x-frame were claimed and functionally described in Clarin's '058 patent (Pl. Ex. 3), '803 patent (Pl. Ex. 4), and '218 patent (Pl. Ex. 6). The functionality of the x-frame's automatic collapsing feature

had been specifically claimed in Clarin's second patent, the '058 patent, in 1934. The protruding feet and double-tube of the double-tube and channel frame were claimed and functionally described in the '803 patent that issued in 1938. The channel part of the double-tube and channel frame was claimed as part of the '218 patent that issued in 1964 and shown to be a functional feature of the chair. Additionally, the double-tube and channel and the protruding feet are described as preferred embodiments in the patents and the functional uses of these features are listed in the specifications.

Witnesses at the trial also testified to the functionality of the features of the folding chair depicted in Clarin's registered trademark. As discussed by Alfred Hergott, the x-frame allows, in addition to the safety feature of automatically collapsing on hitting the floor, an individual to stand on either the front edge or the back edge of the chair without the chair collapsing. (Tr. at 340.) Harvey Hergott explained the importance of minimizing the space between the chairs to fit more into a room or to store more. (Tr. at 260, 263-70.) The ability to weld a ganging device into the channel of the frame meant that the chairs, when ganged together, did not gain additional width beyond the collective width of the ganged chairs. (*Id*. at 265-67.) According to Harvey Hergott, the slanted sides of the B-back chair also allowed for the placing of an armrest, anchored by the ganging device, between two chairs with only a minimal increase in the width beyond that of the two chairs.[7] (*Id*. at 275-77.)

-----

[7]Clarin's current Chief Operating Officer, Roger Schoenfeld, testified at the trial that Clarin produced for litigation two double-tube and channel x-frame chairs with a back panel that was not slanted inward to establish that an interbracket armrest could be placed between such two chairs without increasing their width. (Tr. at 130-31.) The court finds that the possibility of an available alternative design does not contradict Harvey Hergott's testimony that the B-back was developed in part to ensure that the center widths remained the same when an armrest was added between chairs. (Tr. at 274-77.)

Clarin itself in its promotional catalogs touts the functional features of the design of its folding chairs. Clarin's most recent brochure contains an introduction declaring the company "the world's most innovative provider of seating solutions," and characterizing the x-frame design as "revolutionary" and the double-tube and channel as "durable." (Pl. Ex. 9B at 3; Def. Ex. 36 at 3.) In that same catalog, Clarin further extolls the "unmatched strength, durability and flexibility" of the double-tube and channel frame as well as the frame's ability to "'remember' its original shape after use." ((Pl. Ex. 9B at 4; Def. Ex. 36 at 4.Clarin exalts the double-tube and channel frame for providing an "extremely strong but resilient shock-absorbing chair." (Pl. Ex. 8 at 22, Subheading "Design.") Clarin's Senior Vice President of Sales for the Sports and Entertainment Marketplace, Steve Luttazi, acknowledged in his testimony that "our chair has the most flexibility, but all chairs have some sort of flexibility to them." (Tr. at 843.) Specifically, Clarin's advertisements discuss that the double-tube and channel enables the chairs to minimize the amount of space taken up by ganging devices placed in the channel to link chairs together in a row. (Tr. at 89.) According to Clarin's advertising materials, the channel also "provides flat surfaces ideal for solid steel rivets." (*Id.* at 96.) The stability and flexibility features of the double-tube and channel have also been touted by Clarin, in that the frame ensures level seating on uneven surfaces and allows the frame to remember its original shape after use. (*Id*. at 97.) ) In one of its earlier advertising brochures, Clarin spent three-paragraphs distinguishing x-frame chairs from y-frame chairs based on functional attributes such as strength and load-bearing capabilities. (Pl. Ex. 8.) Further extolling the functional attributes of the x-frame, Clarin's sales literature explains that the self-contained nesting design of the x-frame permits accelerated opening and closing and maximizes the use of storage space. (Tr. at 97.) The "Clarin rubber

foot" is also featured as a functional feature in the brochure for protecting floors from marring and reducing noise levels, as well as its easy-to-install-and-remove rubber covers.  (Pl. Ex. 8.) Additionally, though Clarin's patent on its rubber foot has long-expired, Clarin still refers to the feet of the chair in its advertisements as its "patented rubber feet."  (Pl. Ex. 9A at 4; Pl. Ex. 9B at 4; Def. Ex. 36 at 4.)  Clarin has also advertised the functionality of the back panel of its chairs; in one catalog, Clarin said that its back panel has been scientifically proven to provide support of the lumbar region.  (Pl. Ex. 7 at 14.)

During the trial, the evidence established that the one feature of the folding chair depicted in its registered trademark that is not explicitly mentioned in any of Clarin's utility patents, the B-back design, had a functional use.  In opening statements, counsel for Clarin stated that B-back chair is a superior design, from a strength standpoint, than the A-back chair.  (Tr. at 65.) Clarin's Chief Operating Officer, Roger Schoenfeld, also testified that the B-back is stronger than the A-back.  (Tr. at 86.)  In addition, former Clarin President William Peterson, at his deposition, portions of which were submitted into evidence, acknowledged that the B-back was designed to correct the failure of the A-back in certain venues.  (Peterson Dep. at 83, ln. 1-10.) The functionality of the B-back design was never disclosed to the PTO during the Application process; instead Peterson represented in his supplemental declaration that Clarin's motivation behind creating the B-back chair was purely stylistic.  (Tr. at 272; Pl. Ex. 43 ¶ 4.)

The preponderance of the evidence presented at the trial establishes that Clarin developed the B-back as a functional improvement over the A-back chair.  The Clarin B-back was designed in approximately 1987, after Clarin received complaints that the back of its A-back chair was collapsing when used by concertgoers at concert venues.  (Tr. at 272; Cook Dep. at 30, ln. 16-18;

Peterson Dep. at 83, ln. 1-4.)  Concertgoers were sitting on top of the backs of their chairs with their feet on the seats and, as a result, the A-back would bend at the point of the shoulder offset and collapse under the person's weight.  (Tr. at 271-72; Cook Dep. at 30, ln. 16-24.) Additionally, the A-back chairs would also fail when concertgoers would step into the gap between the chairs created by the shape of the A-back chairs when ganged.  (Tr. at 103.)  To solve these safety problems, Clarin developed the B-back as a long term design solution.  (Tr. at 273; Peterson Dep. at 83, ln. 5-10.)  The B-back design eliminated the shoulder offset in the frame where the bending failures were occurring on the A-back chairs by slanting the top of the sides inward in its new B-back design .  (Tr. at 272-74; Cook Dep. at 31, ln. 3-16.)  The improved B-back design distributed weight through the sides and strengthened the back, and narrowed the gap between ganged-together chairs.  (Cook Dep. at 31, ln. 3-16.)  The combination of the double-tube and channel and the B-back design meant that Clarin did not have to give up the double-tube and channel A-back chair's greater flexibility compared to a round, square, or oval tube design chair's flexibility.  (*Id*. at 32, ln. 1-9.)

Expert testimony presented by Clarin confirms that the B-back design creates a stronger back panel than the A-back.  Eduardo De Santiago, Ph.D, P.E., an assistant professor in the Department of Civil and Architectural Engineering at the Illinois Institute of Technology, tested the structural characteristics of the Clarin trademarked B-back chair, (Def. Ex. 274), in comparison to the Clarin A-back, (Def. Ex. 275), and several brands of chairs with no side bends in their back panel that Dr. De Santiago referred to as "arch-back" chairs.  (Tr. at 710, .)  Dr. De Santiago's testimony mostly focused on functional strength, and the amount of deviation from the shape of the structure that occurs due to "load" placed on the structure, as opposed to other

functions of the chairs. (Tr. at 705.) With regard to the B-back design, Dr. De Santiago conducted strength tests on arch-back chairs, the B-back chair, and the A-back chair. (Tr. at 778.) He determined that the B-back design is weaker than an Arch-back chair design. (Tr. at 778.) The B-back, however, was shown to be stronger than the A-back chair. (Tr. at 727-28, 746.) Additionally, when Specialized's counsel asked during cross-examination, "So in the design of a folding chair, the shape of the back is not merely an incidental or ornamental feature?," Dr. De Santiago replied, "They [the shapes of the back] also influence the strength of the chair." (Tr. at 934.)

Dr. De Santiago also found that other features of Clarin's trademark, such as the double-tube and channel, the leg cross braces, and the x-frame, were strength-wise weaker than an alternative design. (Tr. at 749-59, 761, 765.) Ganging devices, which Dr. De Santiago also studied, create a small increase in the strength of the chair's back panel. (Tr. at 776.) Dr. De Santiago acknowledged that the protruding feet may assist in resistance to tipping and stability and may protect the floor and the tip of the chair leg, although the feature does not assist in strength. (Tr. at 771-73.) Dr. De Santiago noted, however, that he tested the chairs only for functionality in the area of strength, and not in other areas of functionality such as the chairs' space capacity, collapseability, flexibility, or comfort. (Tr. at 934-36.) In fact, Dr. De Santiago testified that a chair usually cannot have both flexibility and strength; to have one, the chair gives up on the other, and that he did not test the B-back for its combination of strength and flexibility. (Tr. at 953-54.) Furthermore, Dr. De Santiago stated that the double-tube and channel contributes to the chair's flexibility, although he did not test that function. (Tr. at 955.)

      E.      Clarin's Fraud on the PTO

In addition to not providing Clarin's patents in response to the PTO examiner's request, Clarin did not disclose the functional benefits of the B-back design to the PTO examiner. (Pl. Exs. 29, 36, 38, 40.) Instead, after the examiner had refused Clarin's Application on the grounds of functionality and non-distinctiveness, (Pl. Ex. 42), former Clarin President Peterson, despite personally knowing the B-back had been designed by Clarin for a functional purpose, attested to the PTO in his supplemental declaration that the B-back was created by Clarin's prior management as a "slightly modernized" version of the Clarin A-back. (Pl. Ex. 43 ¶ 4; Peterson Dep. at 83, ln. 1-10.) After Peterson's supplemental declaration was submitted with Clarin's Request for Reconsideration, the PTO allowed publication and registration of the Clarin's Trademark No. 2,803, 875. (Pl. Ex. 1.)

To counter Specialized's claim that Clarin committed fraud on the PTO, Clarin presented expert witness, David Kera ("Kera"), an attorney who specializes in the area of trademark law and a former member of the Trademark Trial and Appeal Board of the PTO. (Tr. at 383.) Mr. Kera reconstructed the file history of the Application, (Ex. 6 of Defendant's Ex. 209; Tr. at 387-90.) Mr. Kera testified to his opinion that no fraud was committed on the PTO by Clarin. According to Mr. Kera and his interpretation of both the undisclosed expired utility patents and trademark law principles, Clarin did not need to disclose any other utility patent aside from the submitted '058 patent to the PTO because the elements of the registered trademark are not, in his opinion, in the patents' claims. (Tr. at 411-24.) The evidence of functionality expressed in the specifications, based on Mr. Kera's understanding, are not material and do not require disclosure. (Tr. at 411-413.) But Mr. Kera conceded that the Trademark Manual of Examining Procedure ("TMEP") does not limit disclosure of utility patents only to those patents which

claim an element of a requested registration. (Tr. at 507-08.) Rather, Mr. Kera acknowledged that the TMEP advises disclosures of patents *involving* the configuration or similar configuration of the features at issue in the application—not limited to disclosure only those patents that *claim* the feature—and that the Trademark examiner made "a broad request" for patents. (Tr. at 507-08, 547.) Mr. Kera also conceded that the Clarin patents "were significant for the limited purpose of showing, for example that the ganging device, the upper and lower portions of the ganging device, rested within the channel," referring to the '218 patent. (Tr. at 542.) Despite these acknowledgments, Mr. Kera concluded that Clarin did not commit fraud because, in Mr. Kera's opinion, no relevant information was withheld from the PTO. (Tr. at 481-82.)

LEGAL STANDARDS

Under the Lanham Act, the registration of a trademark provides the registered trademark owner with the benefit of a rebuttable presumption of the mark's validity. 15 U.S.C. § 1115(a). The rebuttable presumption of validity for registered trademarks, however, does not preclude another individual from proving any legal or equitable defense or defect that could have been raised if the trademark were not registered. *Id.* Even when a registered trademark has become "incontestable" under 15 U.S.C. § 1065, the registered mark may still be subject to cancellation if found to have been obtained fraudulently, to have become generic, to have been abandoned, or to be functional. 15 U.S.C. §§ 1064; 1115; *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001).

Additionally, the Lanham Act protects not only words and symbols, but also "trade dress," which involves the overall appearance of a product, such as product design, size, shape, color or color combinations, texture, graphics, or even particular sales techniques. *Wal-Mart*

18

*Stores, Inc. v. Samara Brothers, Inc*., 529 U.S. 205, 209 (2000); *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 764 n. 1 (1992). Trade dress infringement is established by a showing that (1) a trade dress is either inherently distinctive or has acquired secondary meaning where the public has come to associate a product's trade dress with its source, and that (2) the similarity of the plaintiff's product to the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *Two-Pesos*, 505 U.S. at 769-772 (eliminating the distinction between trade dress and trademark); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999). The Supreme Court has determined that, although product design cannot be inherently distinctive, it is still entitled to Lanham Act protection if it has acquired secondary meaning. *See Wal-Mart*, 529 U.S. at 213-16.

If a purported trademark or trade dress is determined to be functional, the purported trademark or trade dress is not given protection under the Lanham Act, and the court would not need to consider the secondary meaning of the product design and likelihood of confusion because the trademark or trade dress would be invalid. *See TrafFix Devices, Inc. v. Marketing Displays, Inc*., 532 U.S. 23, 26 (2001). As the Supreme Court stated in *TrafFix*,

> The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity. The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.

> *TrafFix*, 532 U.S. at 35-36.

Under the law enunciated by the Supreme Court, a trademark or trade dress is functional if it is essential to the use or purpose of the product or if it affects the cost or quality of the

product. *TrafFix,* 532 U.S. at 32; *Inwood Labs., Inc. v. Ives Labs., Inc.* 456 U.S. 844, 850

(1982). If the party challenging a trademark or trade dress establishes functionality, the

challenging party need not also demonstrate that the trade dress or trademarked product

configuration at issue is a competitive necessity due to lack of alternative designs. *TrafFix*, 532

U.S. at 32-33; *see* TMEP § 1202.02(a)(iii)(A) (4th Ed. 2005). The existence of available

alternative designs "'cannot turn a feature that is functional under the traditional . . . definition

into a non-functional feature which is the exclusive trade dress property of one seller.'" *The

Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 155 (6th Cir. 2003) (quoting 1 J. Thomas

Mccarthy, Mccarthy on Trademarks And Unfair Competition § 7.75 (4th ed. 2003)). Alternative

designs, however, may be relevant with regard to proving functionality as it affects use, cost, or

quality. *Id*. at 156; *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002); *see*

T.M.E.P. § 1202.02(a)(iii)A) (4th Ed. 2005).

The PTO no longer relies on distinctions of "de facto" and "de jure" functionality.

Consequently, this court has gleaned from prior precedent a nonexhaustive list of five factors

that a court may consider when determining whether a trademark depicting a commercial

product is functional, based on caselaw beginning with the opinion *In re Morton-Norwich

Prods., Inc*., 671 F.2d 1332, 1341 (C.C.P.A. 1982), authored by the predecessor to the Untied

States Court of Appeals for the Federal Circuit.[8]

---

[8]In determining functionality, the PTO as of June 2002 ceased its reliance on the terms
"de jure" and "de facto" functionality, which originated in the *In re Morton-Norwich* decision.
*See* TMEP § 1202.02(a)(iii)(B) (4th Ed. 2005). The January 2001 Office Action and January
2002 refusal by the PTO discusses de facto and de jure functionality, but the Office Action and
the Refusal were issued before the TMEP recognized the change in the law. (Tr. 438-439; Pl.
Exs. 39, 42.) The TMEP was revised in June 2002 to reflect the different standard for
functionality being applied by the Supreme Court, and the revised standard was applied to the

These factors suggesting functionality of an item, for which Lanham Act protection should be denied, may include: (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the items's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost. *See TrafFix*, 532 U.S. at 29; *Inwood Labs., Inc.,* 456 U.S. at 850; *Publications Int'l, Inc*., 164 F.3d at 339, 342; *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985); *In re Morton-Norwich*, 671 F.2d at 1341.

The existence of a utility patent creates a presumption that the claimed features in a trademark registration are functional. *See TrafFix*, 532 U.S. at 29. "Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id*. at 29-30. Where there are, for example, ornamental, incidental, or arbitrary aspects in a patent, a manufacturer of the item seeking to establish Lanham Act protection could prove that these elements do not serve a function within the patent. *Id*. at 34. The patent and the patent's prosecution history can aid in determining whether a feature included in the patent has a utilitarian advantage. *Id*. at 32, 34.

Whether a party has a registered trademark or asserts a trademark or a trade dress under common law affects the burden of proof. Because a registered trademark is presumed to be valid, the party claiming the trademark's invalidity has the burden of proof. Where a trademark

---

later request for reconsideration. (Tr. 501-04.)

or trade dress is claimed in common law, but is not registered with the PTO, the party claiming trademark or trade dress protection has the burden of proving that the trademark or trade dress is not functional.  15 U.S.C. § 1125(a)(3).  Under Seventh Circuit law, however, the burden of proof for challenging the functionality of a trademark or trade dress, whether registered or unregistered, lies with the party asserting that the trademark or trade dress is invalid.  *See Publications Int'l., Ltd. v. Landoll, Inc*., 164 F.3d 337, 339-340 (7th Cir. 1998) (acknowledging a circuit split on the issue of whether functionality is an affirmative defense for which the burden of proof rests on the party challenging an unregistered trade dress).  With regard to Clarin's U.S. Trademark Registration No. 2,803,875, Specialized ultimately bears the burden of establishing that Clarin's registered trademark is invalid.

<u>ANALYSIS</u>

**A. Functionality**

1.      The Parties' Contentions

The first issue that must be addressed is whether Clarin's registered trademark depicting a folding chair is functional.  Specialized contends that the features of Clarin's asserted trade dress and the folding chair depicted in Clarin's registered trademark were covered by several of Clarin's expired patents, including the '248 patent, the '058 patent, and the '803 patent.  Clarin, when applying for a trademark registration to the PTO, disclosed only the '058 patent.  In addition, Specialized argues that the reason for the creation of the B-back design was functional—to design a back panel less likely to collapse than the A-back when concertgoers sat on top of the back of the seat—and Clarin did not disclose this motivation to the PTO.  Furthermore, Specialized points to Clarin's advertisements to argue that its trade dress features

depicted in its registered trademark are actually functional.

Clarin, in response, first emphasizes that trade dress involves the overall image of the product and not its individual parts or individual design elements. Clarin further asserts that it is the overall look of Clarin's B-back chair that constitutes its trade dress as depicted in its registered trademark and gives it distinctiveness. Clarin also counters Specialized's allegations about the relation of the B-back features to the expired patents by contending that only the x-frame was a claimed feature of the patents and required disclosure to the PTO during the Clarin prosecution of the Application for its registered trademark.

2. Expired Utility Patents

The court finds that the expired utility patents involve several features of the Clarin trade dress as depicted in the folding chair of Clarin's registered trademark: the x-frame design, the double-tube and channel frame, and the protruding feet. As disclosed by Clarin to the PTO, the '058 patent claims the x-frame feature, and thus the x-frame feature has presumptive utilitarian purpose—enabling the chair to collapse automatically upon falling to the floor for safety purposes—that was not rebutted by the evidence. *See TrafFix*, 532 U.S. at 29-30. Additionally, the '803 and the '216 patents claim the double-tube and channel, respectively of the double-tube and channel frame, creating a presumption of functionality under *TrafFix*. The '803 patent also claims the protruding foot, as discussed earlier in this opinion under the subheading "Clarin's Patents." The claimed features in the expired utility patents are presumptive evidence of functionality under the Supreme Court's decision in *TrafFix*, 532 U.S. at 29-30.

In addition to the presumption of functionality resulting from the patents' claims, the specifications of the expired utility patents provide evidentiary support for a finding of

functionality with regard to the double-tube and channel, the cross bars, and the protruding feet. *See TrafFix*, 532 U.S. at 32; *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S 249, 256 (1945) ("[T]he patentee may not exclude the public from participating in the good will or secure, to any extent, a continuation of his monopoly by resorting to trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, the drawings, or claims of the expired patent, whether or not such matter describes essential elements of the invention or claims."). The specification for the '248 patent refers to the reinforcement function of the double-tube and channel frame. (Pl. Ex. 2 at pg. 1, ln. 47-55.) In that same specification, the inventor also describes the cross bars as functioning to brace and to space the legs. (*Id*. at pg. 1, ln. 56-60.) The preferred embodiments of the double-tube and channel and the cross bars, depicted in accompanying figure drawings in the '248 patent, have the utilitarian purpose of reinforcement and bracing and spacing, respectively. Furthermore, in addition to claiming the protruding feet, the '803 patent describes and provides drawings of the protruding foot in its specification. From the court's review of the evidence, all the features of the Clarin trade dress depicted in its registered trademark, save the B-back, are denoted as utilitarian in the four expired utility patents owned by Clarin. The x-frame, the double-tube and channel, and the protruding feet are therefore presumptively functional.

3.     Utility of the B-Back

The evidence presented at the trial established that the only feature of Clarin's registered trademark and asserted trade dress not mentioned in a Clarin utility patent, the B-back back panel, also serves a utilitarian function. Clarin itself concedes that the B-back is stronger than the A-back. As testified by Harvey Hergott, the B-back chair was designed in response to the

safety problem with A-back chairs regarding concertgoers' sitting on the A-back's back panel and causing the A-back to collapse. The main reason for the change was safety. In addition, the B-back design enabled Clarin to add an armrest to the sides of the folding chairs ganged together that only minimally expanded the width of the ganged chairs. The B-back's implementation was not merely ornamental, incidental or arbitrary; rather the B-back design was an improvement that affected the quality of the product as compared to the A-back. *See Inwood Labs., Inc.,* 456 U.S. at 850; *Publications Int'l, Inc*., 164 F.3d at 339.

To be considered functional, the B-back does not need to be the best design available. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1189 (7th Cir. 1989). All that must be shown is that the design is one of a few superior designs for its purpose or an improvement to the quality of the product. *Publications Int'l, Ltd.,* 164 F.3d at 339; *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985). Precluding a finding of functionality for a feature unless it was the best design would essentially allow the creation of a monopoly for all but the best version of a functional feature. It is enough that the B-back was created to be functionally stronger than the A-back; Specialized need not prove that the B-back is also superior to a chair-back design with straight edges to allow the court to conclude that the B-back is functional.

In addition, the court does not find the testimony of Dr. De Santiago persuasive on lack of functionality of trade dress and the folding chair depicted in Clarin's registered trademark and asserted trade dress and specifically the B-back. Dr. De Santiago's tests show only that the B-back is weaker than the Arch-back chair model that did not have bents or slanted sides near the backrest. Further, Dr. De Santiago's tests established the B-back is stronger than the A-back.

The B-back need not be the best design, it just has to one of the superior designs available, which Dr. De Santiago's testing does not refute. Dr. De Santiago also did not address the any other function aside from strength, in that he did not test flexibility or comfort.

4. Clarin's Advertisements

Clarin's advertisements extolling the utility of Clarin's trade dress features as depicted in its registered trademark weigh in favor of this court's finding that these features are functional. Clarin has for numerous years asserted the utility of its folding chairs' features in its advertisements, emphasizing strength, stability, and comfort. (Pl. Exs. 7 at 14-15; Pl. Ex. 8 at 21-30, Subheading "Design"; Pl. Ex. 9A; Pl. Ex. 9B; Def. Ex. 36.) Further, it is Clarin that labeled its protruding feet as "patented rubber cushioned feet" in its advertisements, strongly suggesting Clarin's belief in the functionality of the protruding feet, in addition to Clarin's focus on the protection and noiselessness provided by its folding chairs' rubber feet. (Pl. Exs. 7 at 14-15, 9B at 4; Def. Ex. 36 at 4.) Clarin's advertisements also exalt the easy storage and collapsibility of the x-frame. (Pl. Exs. 7 at 14-15, 8 at 21-30.) By highlighting in its advertisements the utility of its double-tube and channel x-frame with protruding feet and optional B-back backrest, Clarin provides evidentiary support for the functional nature of its registered trademark. *In re Morton-Norwich Prods., Inc.*, 671 F.2d at 1341.

5. Overall Configuration of Clarin Trade Dress and Folding Chair Depicted in Clarin's Registered Trademark

Ultimately the court finds that each of the features of Clarin's asserted trade dress and the folding chair depicted in Clarin's registered trademark are functional. The claimed features of the x-frame in the '058 patent, the double-tube and channel in the '803 and '218 patents, and the protruding feet in the '803 patent are presumptive evidence of functionality under *TrafFix*.

26

Furthermore, Specialized has met its burden of proof of showing by a preponderance of the evidence that the trade dress features depicted in Clarin's registered trademark and claimed in the utility patents, as well as the B-back and the cross bars, are functional. The court recognizes, however, that to resolve fully the issue of functionality, the court must evaluate the overall image of Clarin's trade dress and the folding chair depicted in Clarin's registered trademark, and not just evaluate the functionality of the individual features of the trade dress or trademark. But a product (or depiction of a product) that cannot appear any other way and still make use of all of the functional components is not eligible for trademark protection. *Publications, Int'l, Ltd.*, 164 F.3d at 342. Where all the features of a configuration are functional, the overall configuration will only be granted trade dress or trademark protection where those functional features are "configured in an arbitrary, fanciful, or distinctive way." *Antioch Co*., 347 F.3d at 158 (*citing TrafFix*, 532 U.S. at 34). In this case, there is no other way to engineer or construct a folding chair using the specific functional features that comprise the Clarin trade dress and the folding chair depicted in Clarin's registered trademark other than to look like the Clarin design.

There is little question that Specialized has used the functional features of the Clarin trade dress as depicted in the folding chair of Clarin's registered trademark to construct essentially an identical-looking folding chair. But there would be no other appearance that Specialized's chairs could take and still make use of all the same functional features as are in the Clarin-asserted trade dress and the depicted folding chair of Clarin's registered trademark. The court also notes that there are a limited number of possible back panels for folding chairs that can perform the functions of strength, spacing, comfort. Giving trade dress or trademark protection to each folding chair design that has a particular functional back panel and additional

functional elements related to the folding chair would limit the market place and consumer use to only that limited number of folding chair manufacturers.

Giving Clarin trade dress or trademark protection would provide Clarin with a monopoly unlimited by time on its chair's appearance which is comprised entirely of functional features that could not be engineered to look any other way. The trademark laws were never intended to allow an indefinite monopoly over functional features. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 164 (1995). It is patent law that serves to protect inventor's ideas in the area of functionality by providing an inventor exclusivity for a limited period of time. *Id.*; 35 U.S.C. § 154, 173. The limited period for patent protection cannot be extended indefinitely into a monopoly through the use of trademark or trade dress protection. *See Scott Paper*, 326 U.S. at 256. Unless intellectual property rights such as those granted by patents or copyrights protect a created item, there is generally no prohibition against copying it. *See TrafFix*, 532 U.S. at 29.

6.      Findings as to Clarin's Registered Trademark and Common Law Trade Dress

The court finds that Specialized has met its burden of proof in establishing that the overall appearance of the folding chair depicted in Clarin's registered trademark and Clarin's asserted common law trade dress are functional. This finding by the court is based in part on the inability of other prospective manufacturers to use the individual utilitarian features of the Clarin registered trademark or trade dress in a design different than Clarin's. As a result, the registered trademark is invalid. *See* 15 U.S.C. § 1064. Because the court has found that Specialized has rebutted the presumption of validity of Clarin's Registered Trademark No. 2,803, 875 by Specialized's proving that the trademark is functional, there is no need to analyze further Clarin's common law trade dress; Clarin's common law trade dress is also functional. *See* 15

28

U.S.C. §§ 1115(a); 1125(a)(3) (both registered and common law trademark may be found invalid if found to be functional, although registration provides the presumption of validity to trademark holder), *see also Eco Mfg., LLC v. Honeywell Int'l, Inc.* 357 F.3d 649, 651-52 (7th Cir. 2003) ("incontestible" registered trademark may still be found invalid if functional).

The finding of functionality also eliminates the need for further analysis of whether Clarin's common law trade dress or Clarin's registered trademark has acquired secondary meaning or whether there is a likelihood of confusion between the two parties' products. *See TrafFix,* 532 U.S. at 33; *Eco Mfg.,* 357 F.3d at 651; *Schwinn Bicycle Co.*, 870 F.2d at 1183. The finding of the invalidity of Clarin's U.S. Trademark Registration No. 2,803,875 also compels the remedy of invalidity of the recordation of that registered trademark with U.S. Customs and Border Protection and voids the seizures of Specialized folding chairs resulting therefrom. Additionally, Specialized's folding chairs cannot infringe Clarin's invalid trademark. Therefore, the court finds in favor of Specialized on its claim seeking a declaratory judgment that Specialized did not infringe Clarin's trademark or trade dress. Likewise, the court finds in favor of Specialized and against Clarin on Clarin's counterclaim for the same reasons.

### B. Fraud on the PTO

The only other issue contested between the parties at trial is whether U.S. Trademark Registration No. 2,803,875 was fraudulently obtained by Clarin, which would provide an alternative ground for invalidating Clarin's registered trademark.[9] In evaluating Specialized

---

[9]The court notes that proof of fraud in the trademark context usually does not affect the result of a case because the party claiming trademark rights still may have protection in the common law, regardless whether the party has defrauded the PTO. *See* McCarthy § 31:60 (2006).

claim under Seventh Circuit law that Clarin engaged in fraud, Specialized must show by clear and convincing evidence that Clarin made a deliberate attempt to mislead the PTO into registering Clarin's mark by presenting materially false and misleading information to the PTO when Clarin was seeking the trademark registration. *Money Store v. Harriscorp Finance, Inc*., 689 F.2d 666, 670 (7th Cir. 1982); *Zip Dee, Inc. v. Domestic Corp*., 900 F. Supp. 1004, 1009 (N.D. Ill. 1995); *see* McCarthy § 31:68. Clarin's intent to deceive must be proven to be "willful." *Smith Int'l, Inc. v. Olin Corp*., 209 U.S.P.Q. 1033, 1043 (T.T.A.B. 1981); McCarthy § 31:66.

The standard for fraud in procuring a trademark registration is less stringent than the standard imposed for fraud in procuring a patent, even though both trademarks and patents are obtained from the same governmental office, the PTO. *See* McCarthy § 31:62. The stricter standard for fraud in the patent context is based on the higher duty owed to the PTO by an applicant when requesting a patent due in part to the *ex parte* nature of the patent prosecution proceedings. *See Medinol Ltd. v. Nuero Vasx, Inc*. 67 U.S.P.Q.2d 1205 (T.T.A.B. 2003); McCarthy §§ 31:62, 31:64. The PTO in issuing a patent creates a right that did not exist prior, whereas a person seeking the registration of a trademark would have probably obtained common law trademark rights prior to the time the registration application for the trademark was filed. *See Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881 (C.C.P.A. 1969); McCarthy § 31:64. Further, all persons seeking trademark registration are subject to an adversarial process in registering a trademark and the publication of the proposed registration of the trademark for public comment, which do not exist in the patent area. *See* McCarthy § 31:62.

In analyzing the issue, the court first must determine whether the undisclosed utility

patents—the '248, '803, '218 patents—were material to the validity of Clarin's trademark registration and should have been disclosed.  Clarin explains that these three expired patents were not relevant to the features of the folding chair that is depicted in Clarin's trademark because the expired patents did not claim these features and the registration relates to the overall appearance of the trademarked chair.  Consequently, according to Clarin, these expired utility patents did not need to be disclosed to the PTO.

As discussed above, the court finds that the functionality of the trademarked chair's features—other than just the x-frame (claimed in the '058 patent)—were in fact claimed by the undisclosed expired patents:  the protruding feet and the double-tube and channel frame.  Even Clarin's expert, Mr. Kera, agreed that the disclosure of the channel in which the ganging device fits as shown in '218 patent was "significant for the limited purpose of showing, for example, that the ganging device the upper and lower portions of the ganging device, rested within the channel."  (Tr. 542.)  Additionally, the PTO requested the disclosure of all utility and design patents involving the subject of Clarin's proposed registration.  This request by the PTO was not limited to just features claimed by the patents, nor did the PTO need to limit its request about patents just to patent claims.  A patent's prosecution history and the specifications set forth in a patent can provide evidence of functionality, as Clarin's undisclosed expired utility patents' specifications did.  *See TrafFix*, 532 U.S. at 32, 34.  Moreover, this court in finding that the elements of the folding chair depicted in Clarin's registered trademark are functional relies heavily on the descriptions and explanations in Clarin's expired utility patents, and the court finds that the PTO examiner would have found these expired patents relevant to the trademark registration determination.  The individual functional features of the folding chair depicted in

Clarin's mark produced an overall appearance that if upheld may preclude a competitor's use of those functional features for an unlimited time. There is no question that the information in these undisclosed patents was material to the validity of the registration.

Based upon an evaluation of all the evidence, the court finds that Clarin deliberately misled the PTO by not disclosing the three expired utility patents. When initially disclosing the '058 patent, covering the folding mechanism of a chair, in Clarin's first reponse to the PTO in 1999, Clarin emphasized the patent's statement that any frame could be used, implying that the frame-type was arbitrary or ornamental. (Pl. Ex. 38 at 5.) Yet, Clarin chose to not disclose the '248 and the '218 patents, which Clarin knew, claimed and described the double-tube and channel frame's functionality. Furthermore, Clarin argued at the trial against a finding of fraudulent intent with regard to disclosure of the patents, pointing out that Clarin in its second 2001 response provided the PTO with a specification regarding the rubber feet that included the identical language describing their function as was in the '803 patent covering the protruding feet. (Def. Ex. 209, Ex. 6 at 2571.) The court finds this evidence cuts the other way, against Clarin. Even after the PTO specifically requested all design or utility patents involving the proposed mark, Clarin—recognizing the relevance of the functional description—chose to bury the functional information in an exhibit of a Clarin chair model specification rather than present the PTO with the '803 patent that claimed the protruding feet and demonstrated their functionality.

In addition to failing to disclose its patents to the PTO, Clarin falsely represented to the PTO that the B-back had been created to "slightly modernize[ ] the configuration" of the design (Pl. Ex. 43, ¶ 4.) Clarin also did not disclose that the B-back had been created as a utilitarian

improvement over the A-back, which collapsed when concertgoers sat on the top of the A-back chair's backrest. Clarin did not inform the PTO that the B-back was conceived to solve the functional problem of the A-back's failing and collapsing. By giving the PTO a misleading reason for the design of the B-back while withholding its utilitarian purpose, Clarin made a material misrepresentation. The court finds that the undisclosed evidence of the B-back's functional purpose was material to the PTO's determination of the validity of the trademark because the declaration provided by Clarin caused the PTO to believe that the B-back design was purely ornamental and without function.

Because Clarin withheld material information and Clarin materially misrepresented the reason for its designing the B-back, the court must next decide whether Clarin deliberately withheld the undisclosed expired utility patents and deliberately misrepresented the impetus for the B-back's creation. Clarin argues that its failure to disclose the utility patents was not a deliberate withholding of material information. Clarin asserts that it did not believe the patents to be relevant to the PTO examiner's determination of whether to allow registration since the patents did not claim features of the proposed trademark. While the court disagrees with Clarin's contention that the undisclosed patents did not claim features of the folding chair depicted in the trademark, that point is not the deciding factor. The PTO asked that Clarin "indicate whether the proposed mark is the subject of either a design or utility patent" and, if so, to "provide all information concerning the patent." (Pl. Ex. 37 at 2.) The PTO did not limit this request to all utility patents *claiming* the proposed mark's features. Based on the PTO's language, the court finds that Clarin clearly understood the PTO's request not to be limited to patents in which the proposed mark's features are claimed. Even if that had been Clarin's

understanding, Clarin still did not furnish to the PTO all such patents claiming the proposed mark's features.

Coupling that with Clarin's misrepresentation of the purpose for Clarin's designing the B-back, the evidence is clear and convincing that Clarin intended to deceive the PTO. When Clarin's then-president, Peterson, submitted the supplemental declaration to the PTO, in which he misleadingly maintained that "prior management slightly modernized the configuration of the outer edges of the back support of the 'A Back' chair" to create the B-back, that knowing misrepresentation was intended to deceive the PTO. (Pl. Ex. 43 ¶ 4.). In his deposition, Peterson, conceded that he knew at the time that the B-back was designed to resolve a functional failing of Clarin's A-back folding chair at certain venues, i.e. concerts, where Clarin's A-back chair collapsed at the bending points of the A-back design. (Peterson Dep. at 83, ln. 1-10.) Peterson's supplemental declaration, describing for the first time to the PTO Clarin's alleged design motivation for the B-back, was submitted along with Clarin's Request for Reconsideration that included also for the first time a written description of the proposed trademark which specifically mentioned the slant edges of the B-back. This was done only after the PTO had rejected three times Clarin's trademark Application as functional. Clarin's conduct constituted a knowing, deliberate and deceitful attempt to gain registration, and Clarin succeeded. The court finds that Peterson's misrepresentation in his supplemental declaration of the utilitarian reason for the B-back to be a deliberate, deceitful misleading of the PTO. This intentional misrepresentation to the PTO was willful because Peterson and Clarin well knew of the utilitarian rationale for the design of the B-back, as evidenced by Peterson's deposition testimony. Specialized has shown by clear and convincing evidence, under all the facts and

circumstances of the case, that Clarin deliberately made fraudulent representations to the PTO that were material to Clarin's obtaining the issuance of its registered trademark. Clarin's fraud on the PTO invalidates Clarin's U.S. Trademark Registration No. 2,803,875.

## CONCLUSION

Accordingly, the court grants plaintiff Specialized declaratory judgment and holds that defendant Clarin's U.S. Trademark Registration No. 2,803, 875 is invalid, that defendant Clarin has no common-law rights in its asserted trade dress, that defendant Clarin committed fraud on the PTO, and that the plaintiff Specialized's products thus cannot infringe Clarin's trade dress or registered trademark. Clarin's motion for judgment as a matter of law on plaintiff's claim that Clarin engaged in fraud on the Patent and Trademark Office (Dkt. No. 93) and Clarin's motion regarding invalid recordation of the mark with U.S. Customs and Border Protection (Dkt. No. 94) are denied. Judgment is entered in favor of Specialized on each of its claims and on Clarin's counterclaims.

ENTER:

James F. Holderman

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: January 30, 2007